LION SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($1,750.000.00).

■ 10. After fully considering plaintiff Jeffrey Robbins' loss of consortium, including loss of society, comfort, companionship and material services, as well as medical expenses, the Court assesses damages against the United States and in favor of plaintiff Jeffrey Robbins in the total amount of TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00).

## JUDGMENT

The Court having this day entered its findings of fact and conclusions of law herein finding the issues in favor of each of plaintiffs and against the defendant, NOW THEREFORE, in accordance therewith,

IT IS HEREBY ORDERED AND ADJUDGED

(1) that plaintiff Roselyn Robbins have and recover of and from the defendant United States of America the sum of $1,750,000.00 and costs, and

(2) that plaintiff Jeffrey Robbins have and recover of and from the defendant United States of America the sum of $250,000.00.

**Phillip C. GOLDSTICK and Joseph W. Smith, Plaintiffs,**

v.

**John KUSMIERSKY, U.S. Managers Realty, Inc. and ICM Realty, Defendants.**

**No. 83 C 2290.**

United States District Court, N.D. Illinois, E.D.

July 24, 1984.

On Motion for Reconsideration Sept. 5, 1984.

Edward T. Joyce, Steven J. Rotunno, Joyce & Kubasiak, Chicago, Ill., for plaintiffs.

James C. Munson, Marjorie P. Lindblom, Kirkland & Ellis, Chicago, Ill., for ICM Realty.

William P. Rosenthal, Robert R. Tepper, Gerald Prokopowicz, Rosenthal & Schanfield, Chicago, Ill., for Kusmiersky and U.S. Managers Realty, Inc.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Phillip Goldstick ("Goldstick") and Joseph Smith ("Smith") sue John Kusmiersky ("Kusmiersky"), U.S. Managers Realty, Inc. ("U.S. Managers") and ICM Realty ("ICM") to collect attorneys' fees owed to the Goldstick & Smith law partnership (now in dissolution). All defendants have moved under Fed.R.Civ.P. ("Rule") 56 for summary judgment on all counts in the Second Amended Complaint (the "Complaint"). For the reasons stated in this memorandum opinion and order, those motions are denied in their entirety as to Kusmiersky and U.S. Managers and granted in their entirety as to ICM.

*Facts* [1]

This dispute arises out of work Goldstick & Smith did to reduce taxes on real estate known as the Meadow property (the "Property"). Analysis of the dispute requires an understanding of each defendant's interest in the Property.

Walter Kassuba ("Kassuba") originally owned both the land and the apartment building improvements on the Property. In an effort to raise capital in 1969, he entered into a sale-leaseback transaction with ICM under the "Lease" (Harney Aff. Ex. A).[2] That placed ICM in the land ownership position, with Kassuba continuing to own the improvements. Lease Art. 4 obligated Kassuba:

1. to pay all expenses of maintaining the Property, including real estate taxes;

2. if he contested tax liability, to make escrow tax deposits to cover taxes, interest and penalties; and

3. not to allow the land to be sold for nonpayment of taxes.

If Kassuba attempted to reduce any tax liability, ICM promised to cooperate—but without cost to ICM.

Kassuba later declared bankruptcy. In 1975 Kusmiersky tried to extricate the Property from the Kassuba bankruptcy and to revitalize it by:

1. buying the improvements through two land trusts (the "Land Trusts") under which Central National Bank was Trustee and Community Associates, a limited partnership in which Kusmiersky is the general partner, owned the beneficial interest (Kusmiersky Dep. 7–9); and

2. obtaining an assignment of the Lease.

ICM then:

1. entered into an amended Lease (Harney Aff. Ex. B, Art. 4) containing real estate tax provisions virtually identical to those in the original Lease;

2. in order to finance the operating expenses of the Property, made non-recourse loans to the Land Trusts (Kusmiersky Dep. Exs. 2 and 3), secured by security interests in the improvements, proceeds, occupancy leases and the Lease; and

3. entered into an agreement with the Land Trusts (Pl.Ex. 11) as to how the monies loaned by ICM were to be spent.

Both Land Trusts entered into an agreement with U.S. Managers, another Kusmiersky-controlled entity, to manage the Property (Baker Dep. I 17–18).

In conjunction with Kusmiersky's acquisition of the Property and other Kassuba properties, U.S. Managers engaged Randy Strassburg ("Strassburg") to attempt to reduce current tax liabilities on those properties (see documents designated as Baker Dep. Ex. 19). Strassburg then engaged Goldstick to work on the current reduction on the Property.

Sometime in 1975 Kusmiersky approached Goldstick about the reduction of back tax liabilities for the Property. Although doubt exists as to whether an express agreement was reached in that respect,[3] Goldstick & Smith (mostly through Smith's efforts) did do the work on back taxes. By November 1977 they had obtained a back tax reduction of $872,374.30 (Pl.Ex. 19). According to all the evidence submitted on the current motion, the Goldstick & Smith fee was based upon a percentage of the tax reduction obtained. To date Goldstick & Smith have not been paid any fee for their efforts in getting the $872,374.30 reduction.

---

**1.** This factual statement is drawn from the parties' submissions. As always on a summary judgment motion, all reasonable factual inferences have been drawn in favor of the non-movant. *Korf v. Ball State University,* 726 F.2d 1222, 1226 (7th Cir.1984).

**2.** Like most if not all sale-leasebacks, this may have been viewed as a financing transaction. None of the parties providing primary financing superior to ICM's position (mortgagees) is involved in this action.

**3.** In an attempt to memorialize an agreement, Baker (U.S. Managers' legal counsel) wrote a September 5, 1975 letter (the "September 5 Letter," attached Ex. A) setting out terms of the contemplated arrangement, and Goldstick sent back a revised draft dated September 19, 1975 (the "September 19 Letter," attached Ex. B).

On June 30, 1978 Ted Netzky ("Netzky") acquired the Land Trusts' and Community Associates' interests in the Property. U.S. Managers continued to manage the Property. Before the June 30 closing Netzky had said he would not close the deal without getting a release from Goldstick for any claim against either Netzky or the Property for the attorneys' fees (Baker Dep. I 83–84). That produced a flurry of activity at the closing:

1. ICM gave Goldstick a written proposal to pay Goldstick a reduced amount ($250,000 plus interest) over a period of years, but only if the Property turned enough of a profit to pay the fee (Goldstick Ex. 2).

2. Goldstick refused to sign that proposal because he would not accept an arrangement contingent on profits from the Property (Goldstick Dep. I 41–47).

3. After some discussion with ICM representatives Thomas Davis ("Davis") and Anthony Harney ("Harney"), Goldstick insisted on talking with Kusmiersky, who was in Japan.

4. After Kusmiersky had talked with Davis and Baker, he convinced Goldstick to sign the release Netzky had demanded. In essence Kusmiersky assured Goldstick the ICM representatives were honorable people and could be trusted to work out some arrangement to pay the fees (Kusmiersky Dep. 55–58).

5. Goldstick signed the release and allowed the closing to proceed.

Davis and Harney testified they never reached agreement with Goldstick on whether he would get paid fees without regard to the Property's performance (Harney Dep. 72; Davis Dep. 67–68).[4] It is unclear whether the back taxes (as reduced) were paid before or after June 30, 1978 (Baker Dep. II 23; Kuntz Dep. 21–22; Kusmiersky Dep. 45).

After the closing Goldstick went to New York to talk with ICM representatives in an attempt to negotiate further for payment of the fees. No agreement was reached.

### Plaintiffs' Claims Against Kusmiersky and U.S. Managers

Smith asserts three different theories to support recovery of fees from Kusmiersky and U.S. Managers:

1. breach of an express written or oral contract;

2. breach of a contract implied in law; and

3. promissory estoppel.

Both Kusmiersky and U.S. Managers have moved for summary judgment on all Smith's claims.

Each argument will be considered in turn. But before turning to the merits, this Court must examine the question of Smith's capacity to sue at all.

Goldstick has refused to join in the claims against Kusmiersky and U.S. Managers,[5] and they argue one partner alone may not sue to collect a partnership asset. Smith retorts that when a partnership is in dissolution any one partner has that capacity. Under Rule 17(b), this Court must look to Illinois state law to decide that question.

Ordinarily all partners to a partnership must join in an action to collect a partnership asset. 29 I.L.P. *Partnership* § 172, at 371. But when a partnership has been dissolved for any reason, any one partner can wind up the partnership affairs and collect the partnership assets. 29 I.L.P. *Partnership* § 242, at 424; *Heartt v. Walsh*, 75 Ill. 200, 202 (1874); Ill.Rev.Stat. ch. 106½, § 35(1)(a). That ability to collect partnership assets must include the individual partner's right to sue to collect such assets. See *Slaboszewski v. Johnson*, 11 Ill.App.2d 241, 136 N.E.2d 560 (1st Dist. 1956) (deceased partner's estate need not be joined as a plaintiff in suit by surviving

---

**4.** There is some testimony ICM, through Kusmiersky, may have offered before the closing to pay the fee without regard to the Property's performance (Goldstick Dep. I 39–40; Kusmiersky Dep. 45–52).

**5.** Smith argues that refusal is due to Goldstick's continuing business relationship with Kusmiersky.

partners to collect partnership asset). Hence Smith as a former partner has the capacity to sue to collect the partnership asset, the fee, in winding up the partnership affairs.

### 1. *Express Contract*

■ Initially Smith asserted the September 5, 1975 Letter embodied the parties' agreement. But in light of Goldstick's September 19 redraft of that letter, which changed some of the terms and to which Kusmiersky and U.S. Managers did not expressly consent, it certainly cannot be said as a matter of law *either* letter—or the letters in conjunction—represent a complete integration of the parties' agreement.

Kusmiersky and U.S. Managers contend they had an oral agreement with Goldstick, including a contingency that released both of them from liability for fees if they ceased to have an interest in the Property before payment of the back taxes that remained after Goldstick & Smith reduced the amount of tax liability. Smith argues the contingency was different: No fee would be due from Kusmiersky and U.S. Managers if their interest in the Property ceased before completion of the work involved in getting the tax reduction.

Both arguments have support in the record presented to this Court. In support of defendants' contention are the following items:

1. U.S. Managers' September 5 letter says the fee "will be due and payable only when the Kusmiersky affiliate, vested with title, can obtain from Pioneer National Title Insurance Company a policy of title insurance reflecting no exception for the delinquent taxes involved." Maybe that can be construed as referring to actual *issuance* of the title policy in that form, which would occur only after the back taxes (as reduced) had actually been paid.[6] In other words, such a title policy would show exceptions for unpaid taxes unless such taxes were paid or disposed of to the satisfaction of the title company (Kusmiersky-U.S. Managers R.Mem.Ex. 1, Schedule B II).

2. Fees for reducing taxes are customarily paid when taxes are paid (Smith Dep. 118–19).

3. Kusmiersky's arrangement with Strassburg for reducing *current* tax liabilities contained a provision that said no fee would be due if the real estate were abandoned to the lender (Baker Dep.Ex. 19; Nov. 24, 1975 letter).[7]

4. Kusmiersky testified the September 5 Letter was to change the calculation of the amount of money to be paid as the fee, but left the rest of the Strassburg agreement intact (Kusmiersky Dep. 30–31).

Conversely, several items of evidence support Smith's version of the contingency:

1. As n. 6 reflects, the September 5, 1975 Letter can also fairly be read as calling for payment as soon as the lawyers had obtained the tax reduction.

2. To precisely that effect, Goldstick's September 19, 1975 Letter stated:

Any Kusmiersky affiliate agrees to make payment of any such reduced tax bill after receiving notice, instanter, to the proper collecting authority. The said fee will be due and payable only when the Kusmiersky affiliate, vested with title, receives the written evidence required by Pioneer Title Insurance Company in Chicago in order to waive

---

**6.** But the quoted language can of course be read to favor Smith's position instead. "Delinquent taxes involved" can be taken to mean the taxes eliminated by the reduction rather than the back taxes in their entirety, so that the title company's willingness to confirm the validity of the reduction (which would take place before the reduced taxes were in fact paid) would trigger the obligation to pay the lawyers' fees. Surely that is a permissible reading, given the nature of the tax lawyers' undertaking. And that alone may be enough to block summary judgment now.

**7.** However both the September 5 and September 19 Letters recite the agreement for back taxes is distinct from the Strassburg arrangement.

the specific objections related to any such individual tax liability.[8]

Indeed Kusmiersky-U.S. Managers R.Mem. 8 specifically says "the language which Goldstick proposed to add did not change the time when the fee would be due and payable...."

3. Smith testified Goldstick told him the letters meant the fee was due when the work was completed (Smith Dep. 24–25, 37, 142–43).[9]

4. As n. 7 reflects, both letters say the arrangement for back taxes is distinct from the Strassburg agreement.

5. Some testimony shows the back taxes might have been paid before the closing (Kuntz Dep. 21–22; Baker Dep. II 23, 49; Kusmiersky Dep. 45).

Weighing the evidence is, of course inappropriate on a Rule 56 motion, so this Court does not rule on the relative persuasiveness of the parties' positions. But it is abundantly clear Smith's version is at least permissible—and perhaps a good deal more than that. Summary judgment cannot be granted Kusmiersky and U.S. Managers on the express contract claim.

### 2. *Implied Contract*

■■ Kusmiersky and U.S. Managers correctly contend the theory of a contract implied in law is unavailable if there is an express contract between the parties. *Industrial Lift Truck Service Corp. v. Mitsubishi International Corp.*, 104 Ill. App.3d 357, 360–61, 60 Ill.Dec. 100, 103, 432 N.E.2d 999, 1002 (1st Dist.1982). But here the very existence of an express contract is in dispute. Dismissal of the implied contract claim would at a minimum be premature.

### 3. *Promissory Estoppel*

■ Defendants also contend Smith cannot establish a promissory estoppel because any promises by Kusmiersky and Baker were not unambiguous promises to pay

fees, but were at most assurances insufficiently certain to entitle Goldstick & Smith to act in reliance on those assurances. *Levitt Homes Inc. v. Old Farm Homeowners' Association*, 111 Ill.App.3d 300, 314–15, 67 Ill.Dec. 155, 165, 444 N.E.2d 194, 204 (2d Dist.1982). On that score the parties' submissions show:

1. Smith recalls discussions with Baker and Kusmiersky before September 1975 in which both of them told Smith he would get paid when he did the work (Smith Dep. 21–25). Kusmiersky disputes that (Dep. 24–26).

2. Smith spent a year's worth of time in doing the work (Smith Dep. 52–59).

3. In December 1975 Goldstick sent a bill for work done in reducing some back taxes. Those taxes were paid immediately, and the fee for that work was paid in March 1976 (Smith Summary Judgment Exs. E and F).

Again that evidence does not permit a decision adverse to Goldstick & Smith as a matter of law. Smith's testimony alone is enough to support an inference the Baker-Kusmiersky promises were more than "mere assurances." And defendants in fact paid some fees for work done in reducing back taxes. With the required favorable inferences in Smith's favor, it is surely possible to find promises plus reasonable detrimental reliance. This claim too must survive.

### *Plaintiffs' Claims Against ICM*

Smith also asserts ICM is liable for the fee on several possible theories:

1. Kusmiersky was acting as ICM's agent in entering into an express contract with Goldstick & Smith as to the fees.

2. At the closing ICM made an express oral contract with Goldstick to pay the fees.

---

**8.** It will be noted the second sentence is really just a rephrasing of the concept stated in n. 6.

**9.** Defendants object to Smith's testimony as hearsay. But Smith's testimony may be admitted not to show the agreement *in fact* contained

the contingency Smith claims, but rather to show Goldstick's understanding of the contingency. That non-hearsay use bolsters Smith's version of the agreement.

3. ICM is estopped from denying liability because it promised to pay the fee, and in reliance on that promise Goldstick signed the release Netzky requested.

4. ICM is liable under a contract implied in law.

ICM too has moved for summary judgment all down the line. Once more each argument will be considered in turn.

### 1. *Kusmiersky as ICM's Agent*

In part the Complaint alleges a written contract. Smith's response to ICM's motion says even if there were no written contract, Kusmiersky was still acting as ICM's agent in entering into an oral agreement with Goldstick.

As already discussed, it is unclear whether Kusmiersky and Goldstick in fact arrived at any agreement, either written or oral. But ICM argues it is not liable even if such an express agreement did exist, because Kusmiersky was not authorized to enter into any agreement *on behalf* of ICM.

ICM submits as evidence its agreements with the Land Trusts, under which ICM promised to join in any proceeding required to reduce tax liability—but without expense to ICM. That limitation tracks entirely with the ICM relationship with the Property: that of a lessor under a net lease, with all operations being carried out by and for the benefit of the lessee (though as title holder ICM might be required to be a formal party to legal proceedings).

■ Such an express limitation of authority of the lessee to act for the lessor can be overcome only by a showing ICM took actions sufficiently inconsistent with that limitation to raise a fact issue as to Kusmiersky's authority to bind ICM to any promises to pay the fee. *Schoenberger v. Chicago Transit Authority*, 84 Ill.App.3d 1132, 1138–39, 39 Ill.Dec. 941, 947, 405 N.E.2d 1076, 1082 (1st Dist.1980).

■ Smith points to a number of ICM actions:

1. ICM loaned money to the Land Trusts, knowing the funds would be used to pay taxes and the expense of reducing taxes.[10]

2. ICM representatives would examine bills before authorizing payments.

3. Smith named ICM in a tax case and verified facts for that suit with an ICM representative.

4. Kusmiersky talked with ICM before he would agree to pay a larger fee for reducing back taxes.

5. ICM disagreed with a fee on one bill. Goldstick reduced the fee after talking with Kusmiersky, who had spoken with ICM representatives.

6. ICM representatives assured Smith and Goldstick a fee would be paid when taxes were reduced.

Those items are wholly unpersuasive—even with the requisite favorable factual inferences running to Smith—to create an implied agency.

Smith prefers to gloss over the controlling aspect of the ICM place in the transaction: It was a *lender*, having agreed to loan $1.5 million to Kusmiersky to deal with Property-related financial requirements. Because the loan was non-recourse as to Kusmiersky, ICM of course had an important stake in policing at least some aspects of Kusmiersky's commitments and expenditures of the loaned funds (much as a construction lender does, see Kusmiersky Dep. 10; Baker Dep. I 59–60). It requires an impermissible leap of faith to argue (Smith Mem. 36–37) that because *Kusmiersky* was *not* personally liable to ICM on the loan, *ICM* somehow *was* rendered personally liable to third parties (as distinct from its loan commitment running only to Kusmiersky) for contractual undertakings made by Kusmiersky to those third parties.[11]

---

**10.** Smith also contends ICM paid fees directly to Goldstick & Smith. That assertion is not supported by the tendered facts.

**11.** Five of Smith's asserted evidentiary items (all but the last) clearly fall with the text's rejection of his theory. As for the last item, the alleged assurances of payment (which do not really rise to that level) are no more than the confirmation of ICM's loan commitment to Kusmiersky,

Smith's agency contentions may perhaps be imaginative—or fanciful would be more like it—but they are legally bankrupt. ICM is entitled to summary judgment on that claim (Complaint Count VI).

### 2. *Oral Contract Entered into at the Closing*

ICM asserts (1) no oral contract exists because all its terms were not agreed to at the closing—some were left for agreement in the future—and (2) any arguable oral contract would be barred by the statute of frauds. Because the first contention is a winner, the second need not be discussed.

■■■■ For an oral contract to be enforceable, all its essential terms must be ascertainable. *Abrams v. Illinois College of Podiatric Medicine*, 77 Ill.App.3d 471, 476, 32 Ill.Dec. 680, 683–84, 395 N.E.2d 1061, 1064–65 (1st Dist.1979). All the evidence shows Goldstick and ICM did not reach an agreement about whether payment of the fee was to be contingent on the Property's financial success. Even after Goldstick's discussion with Kusmiersky on the telephone, the parties agreed to work out that term *in the future*. Based upon ICM's promises to do so, Goldstick signed the requested release.

Undoubtedly any such contingency provision (or its total elimination) represented an essential term of any agreement to pay. When such an essential term is left for future negotiation, there is no enforceable contract. *Hintz v. Lazarus*, 58 Ill.App.3d 64, 67, 15 Ill.Dec. 546, 548, 373 N.E.2d 1018, 1020 (2d Dist.1978). Smith's submissions simply do not support his assertion ICM promised to pay without any contingency *at all*. Smith has thus failed to raise a fact issue in that respect, and ICM is entitled to judgment as a matter of law on Smith's oral contract claim.

which was anticipated to suffice to cover the back taxes and fees.

**12.** It is therefore unnecessary to consider ICM's other arguments that plaintiffs have incurred no detriment, that the claim is barred by the statute

### 3. *Promissory Estoppel*

■■■ ICM argues promissory estoppel is not applicable to this case because:

1. ICM's statements at the closing were not unambiguous promises to pay.

2. Goldstick & Smith did not rely on those statements to their detriment.

3. Any promissory estoppel claim is barred by the statute of frauds.

Once more only ICM's first argument need be considered.

What Smith seeks to enforce is a promise to pay the fee *without* any contingency based on the Property's performance. Yet none of the evidence Smith submits supports the inference ICM made such a noncontingent promise to pay. ICM representatives merely assured Goldstick they would "work it out" (Goldstick Dep. I 51–54).

It is true Kusmiersky, in testifying ICM representatives explained the terms of the proposal, does not remember any mention of making payment contingent upon the profitability of the Property (Kusmiersky Dep. 56–58). But that does not support the inference ICM made an unambiguous noncontingent promise. After all Kusmiersky's overall testimony was that he assured Goldstick that Davis and Harney were honorable people and would work out any disagreements, and that assurance is why Goldstick signed the release (Kusmiersky Dep. 57; Goldstick Dep. I 115–16). And the parties' post-closing conduct is inconsistent with an unconditional promise. Goldstick went to New York in an attempt to "work things out" with ICM. ICM refused to pay the fees without a contingency based upon the profitability of the Property.

In sum, Smith's promissory estoppel claim against ICM also rests on the nonexistence of any contingency or ambiguity in its alleged promise. ICM's assurance to "work it out" in the future was not such an unambiguous promise.[12]

of frauds (*Libby-Broadway Drive-In, Inc. v. McDonald's System, Inc.*, 72 Ill.App.3d 806, 809–10, 28 Ill.Dec. 802, 805, 391 N.E.2d 1, 4 (1st Dist. 1979)), or that plaintiffs should not be allowed

#### 4. *Implied-in-Law Contract*

ICM urges plaintiffs cannot sue on an implied-in-law contract theory because they already have an express oral or written contract with Kusmiersky and U.S. Managers. When there is an express contract between two parties, courts will not imply a contract to hold a non-party to the contract liable for a benefit conferred. *Daley v. G'Sell,* 102 Ill.App.3d 548, 551, 58 Ill.Dec. 524, 526–29, 430 N.E.2d 556, 558–59 (1st Dist.1981). But it has already been held unclear whether an express agreement existed, in light of the asserted disagreement on a material term. That precludes dismissal of the claim against ICM on that ground alone.

But ICM is still entitled to summary judgment on this claim, because it is not liable on an implied-contract theory irrespective of whether any contract existed between plaintiffs and U.S. Managers and Kusmiersky. As *Rutledge v. Housing Authority of the City of East St. Louis,* 88 Ill.App.3d 1064, 1069, 44 Ill.Dec. 176, 179–80, 411 N.E.2d 82, 85–86 (5th Dist.1980) reminds us, the key consideration in deciding whether an implied-in-law contract should be imposed is this:

> [I]t is important to consider the context in which particular services are rendered in determining whether any benefit accruing to the defendant would be unjustifiably retained absent the intercession of equitable principles. It is *unjust* enrichment which is to be avoided. (*Chandler v. Washington Toll Bridge Authority* (1943), 17 Wash.2d 591, 137 P.2d 97, 102; Restatement of Restitution § 1, Comment c (1937).) The restatement articulates this fundamental aspect of the doctrine:
>
> > c. *Unjust retention of benefit.* Even where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it. The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor.

It follows from the requirement of an inequity that there is no general responsibility to compensate one for work and labor done irrespective of the circumstances in which it is carried out.

Smith's recital of the same events unsuccessfully advanced in support of his promissory estoppel claim does not raise a fact issue as to any asserted "unjust enrichment" of ICM, such as to require its payment of the attorneys' fees at issue here.

Illinois has always imposed personal liability for real estate taxes for a tax year on the "owner of real property" on January 1 of that year. Ill.Rev.Stat. ch. 120, ¶ 508a. *Gamble v. People,* 117 Ill.App.3d 784, 786–87, 73 Ill.Dec. 282, 284, 454 N.E.2d 26, 28 (1st Dist.1983); *Griffin v. Gould,* 72 Ill. App.3d 747, 748, 28 Ill.Dec. 925, 926, 391 N.E.2d 124, 125 (1st Dist.1979). *People v. Chicago Title & Trust Co.,* 75 Ill.2d 479, 489–94, 27 Ill.Dec. 476, 480–82, 389 N.E.2d 540, 544–46 (1979) teaches that "owner," in the context of the tax statute, focuses on who derives the benefits from, and bears the burdens of, the real estate ownership—not simply on who is the legal title holder.

Though *Chicago Title* dealt directly with the position of the land trust beneficiary vis-a-vis the trustee, its entire conceptual treatment of the statutory meaning of "ownership" has equal force here. Before the closing ICM held the legal title to the Property, but under the sale-leaseback arrangement it had none of the real benefits or burdens of ownership. All those benefits and burdens inured to the lessee's (the Land Trusts') beneficiary—Community Associates.[13] Under the analysis employed in

---

to assert a theory not expressly advanced in the Complaint.

**13.** Arrangements such as the Lease are termed, in the real estate trade, "net leases" or "net net leases" or even "net net net leases." All the terms are meant to convey the concept that all the economic attributes of ownership inure to the lessee. As n. 2 indicates, such sale-leasebacks are often viewed as pure financing transactions—despite the reversionary interest in the lessor, the value of which is normally reflected

*Chicago Title*, ICM would therefore not be personally liable for any of the real estate taxes involved here.

 What of the possible argument that—despite the absence of personal liability—the equity value of ICM's reversionary interest in the Property increased because of the tax reduction? Were this a straight financing transaction (such as a mortgage), that would be wholly unpersuasive. But even if ICM's ultimate reversion were deemed to distinguish the situation from a pure financing arrangement (on the theory a mortgagee (say) would be certain to benefit only in case of default, while a sale-leaseback lessor is certain to benefit some years later in any case [14]), Smith would still not prevail. Illinois landlords are not liable to their tenants for improvements the tenants voluntarily make to property—absent of course an agreement to the contrary. *Johnston v. Suckow*, 55 Ill.App.3d 277, 279, 12 Ill.Dec. 846, 849, 370 N.E.2d 650, 653 (5th Dist.1977). Kusmiersky's and U.S. Managers' attempt to reduce the back taxes is at best analogous to an "improvement" to the Property, for any reduction of the tax liability would reduce the amount of any tax lien on the Property, thus presumably increasing its equity value.

 In sum, the absence of ICM's personal liability for the back taxes means their elimination, without ICM's having to pay the expenses of obtaining that result, does not in law confer an unjust benefit on ICM. And in light of the rule as to the landlord's non-liability for tenant improvements, Smith's submissions do not at all show why ICM would be "unjustly enriched" by not having to pay for the value of that "improvement." [15] Smith cannot prevail on the implied-in-law theory either.

### Conclusion

Kusmiersky's and U.S. Manager's motions for summary judgment are denied. There is no genuine issue of material fact, and ICM is entitled to a judgment as a matter of law, on all of plaintiffs' claims.

### EXHIBIT A

(213) 550-1360

## U. S. MANAGERS

A CALIFORNIA CORPORATION

*Suite 800*
*433 North Camden Drive*
*Beverly Hills, California 90210*

CONFIDENTIAL AND PRIVILEGED

September 5, 1975

Phillip Goldstick, Esquire
Goldstick, Nye & Bernstein
111 W. Washington St.
Suite 1920
Chicago, Illinois 60602

in negotiating the "interest" rate (the net rent) charged the lessee.

14. Under the Lease as amended when Kusmiersky came into the transaction, the lessee had an original 30-year term plus options extending out for as much as 69 additional years. Thus the ultimate benefit to the lessor—except in case of default, which would be a contingency wholly parallel to that involved in a mortgage transaction—would be the attenuated present value of a benefit to be realized anywhere from 30 to 99 years hence. That present value would be far less than the $250,000 or more in fees Smith would call on ICM to pay now. Such a result would unjustly enrich not ICM but—given their lack of direct relationship—Smith.

15. See this Court's previous discussion rejecting Smith's agency theory.

Re: Fee for legal services

Dear Mr. Goldstick:

This letter is intended to confirm the arrangement for fees for legal services rendered and to be rendered in the future by your office in the representation of John Kusmiersky and his affiliates and nominees in administrative and judicial appeals on certain Cook County properties. Please distinguish the fee arrangement set forth here from the arrangement which Mr. Kusmiersky and affiliates and nominees have presently in force with Randy Strassburg on an exclusive basis across the board in the appeal of assessed valuation for these same properties as well as the balance of the "Kassuba/Kusmiersky package." That Strassburg arrangement will continue into the future and will not be affected in any way by this special representation on particular matters relating to these particular properties.

Your office has caused an administrative review to be commenced with respect to the interest and penalties which have been levied in respect of delinquent real estate taxes for Meadow I and II and Hickory I and II. It is conceivable that after exhausting the administrative processes, judicial review will be required. For all of your services including costs incurred, you are to receive a fee in an amount equal to 50% of the first $100,000.00 of actual savings of interest and penalties on delinquent taxes for these properties. Savings in excess of $100,000.00 will earn for you an additional fee equal to one-third of these excess savings. The said fee will be due and payable only when the Kusmiersky affiliate, vested with title, can obtain from Pioneer National Title Insurance Company a policy of title insurance reflecting no exception for the delinquent taxes involved.

Your office has also undertaken administrative and judicial appeals for the reallocation of delinquent taxes between Meadow I and II. In the event a net savings should result in the aggregate tax bill of these delinquent taxes, your fee for services rendered and expenses incurred will be one-third of these net savings. As this issue is presently about to become a subject of litigation, when a final Order of a Court of competent jurisdiction has adjudicated the issue resulting in such net tax savings, your fee would be at that time due and payable.

Please initial a copy of this letter and return it to me to reflect your agreement to these terms.

My personal regards,

John G. Baker

JGB:mlt
Enclosure

UNDERSTOOD AND AGREED TO:
Goldstick, Nye & Bernstein

by_____

Dated;_____

EXHIBIT B

# memo )

RECEIVED

SEP 29 1975

September 26, 1975

Enclosed please find revised
Agreement for legal services.

If same meets with your ap-
proval, please process same
accordingly.

50% of first $100,000 savings
+ 33% of 4 over

| PROJ | SAVINGS | FEE |
|---|---|---|
| HICKORY I | | |
| 1972 TAX SALE | 15,277.36 | 7,640.63 |
| 1973/4 TAX | 53,408.00 | 26,704.00 |
| W.G. I | | |
| 1972/4 TAX | 40,598.13 | 20,299.06 |
| W.G. II 1972/73/74 | 19,503.45 | 17,363.33 |
| TOTAL | 128,787.63 | 50,002 |
| | | + 9,499.92 |
| | | $59,499.92 |

PHILLIP C. GOLDSTICK

CONFIDENTIAL AND PRIVILEGED September 19, 1975

Phillip C. Goldstick and
 Joseph W. Smith
111 West Washington Street
Suite 1920
Chicago, Illinois 60602

 Re: <u>Fee for legal services</u>

Dear Messrs. Goldstick and Smith:

 This letter is intended to confirm the arrangement
for fees for legal services rendered and to be rendered in
the future by your office in the representation of
John Kusmiersky and his affiliates and nominees in adminis-
trative and judicial appeals on certain Cook County properties.
Please distinguish the fee arrangement set set forth here from
the arrangement which Mr. Kusmiersky and affiliates and nominees
have presently in force with Randy Strassburg on an exclusive
basis across the board in the appeal of assessed valuation for
these same properties as well as the balance of the "Kassuba/
Kusmiersky package." That Strassburg arrangement will continue
into the future and will not be affected in any way by this
special representation on particular matters relating to these
particular properties (Hickory I and II; Meadows I and II).

 Your office has caused an administrative review to be
commenced with respect to the interest and penalties which have
been levied in respect of delinquent real estate taxes for
Meadows I and II and Hickory I and II. It is conceivable that
after exhausting the administrative process, judicial review
will be required. For all of your services, you are to receive
a fee in the amount equal to 50% of the first $100,000.00 of
actual savings of interest and penalties on delinquent taxes
for these properties. Savings in excess of $100,000.00 will
earn for you an additional fee equal to one-third of these ex-
cess savings. Any Kusmiersky affiliate agrees to make payment
of any such reduced tax bill after receiving notice, instanter,
to the proper collecting authority. The said fee will be due
and payable only when the Kusmiersky affiliate, vested with
title receives the written evidence required by Pioneer Title
Insurance Company in Chicago in order to waive the specific
objections related to any such individual tax liability.

 Your office has also undertaken administrative and
judicial appeals for the reallocation of delinquent taxes
between Meadows I and II. Any savings shall be based upon
the following 1973 assessed valuations: MEADOWS I - parcel
07-12-203-007 in the amount of $2,511,673.00; parcel
07-12-203-008 in the amount of $65,209.00; MEADOWS II -
parcel 08-07-203-010 in the amount of $635,646.00; parcel
07-12-203-011 in the amount of $257,822.00. In the event a
net savings should result in the aggregate tax bill of these
delinquent taxes, your fee for services rendered will be
one-third of these net savings. As this issue is presently
about to become a subject of litigation, when a final Order
of a Court of competent jurisdiction has adjudicated the

issue resulting in such net tax savings, your fee would be at that time due and payable.

Please initial a copy of this letter and return it to me to reflect your agreement to these terms.

My personal regards,

JOHN G. BAKER

JGB
Enclosure

UNDERSTOOD AND AGREED TO:
Phillip C. Goldstick and
Joseph W. Smith

BY: _____

DATED: _____

---

## ON MOTION FOR RECONSIDERATION

This Court's July 24, 1984 memorandum opinion and order (the "Opinion") denied the motion of John Kusmiersky ("Kusmiersky") and U.S. Managers Realty, Inc. (collectively "defendants")[1] for summary judgment. Now defendants move for reconsideration, advancing two arguments:

1. Joseph Smith ("Smith") alone does not have capacity to bring this action on behalf of the dissolved Goldstick & Smith partnership.

2. This Court failed to give proper weight to the conversation between Phillip Goldstick ("Goldstick") and Kusmiersky, purportedly establishing an oral contract with an express contingency relieving defendants of liability for the attorneys' fees.

 As to defendants' first argument, they have provided no case law to support such a limited reading of the Uniform Partnership Act (the "Act"), the Illinois version of which is Ill.Rev.Stat. ch. 106½,

§§ 35(1)(a) and § 37 (for convenience provisions of the Act are cited simply "Section —"). To the contrary, other courts interpreting the identical provisions of the Act in other jurisdictions have consistently held that after dissolution of a partnership any one partner is indeed empowered to bring suit to collect a debt owed the partnership. *Marksill Specialties, Inc. v. Barger*, 428 N.E.2d 65, 68 (Ind.Ct.App.1981); *Stark v. Utica Screw Products, Inc.*, 103 Misc.2d 163, 425 N.Y.S.2d 750, 752–53 (N.Y.City Ct.1980).

Defendants would have it that, after partnership dissolution, any partner's withholding of personal consent to suit against the partnership's debtor could frustrate bringing the action. Were that so, the authority given by Sections 35(1)(a) and 37 would be illusory. Absent some compelling policy reason (and none is even suggested), surely that kind of bizarre statutory interpretation ought to be avoided.

---

**1.** ICM Realty was also an original defendant, but the Opinion granted its summary judgment motion.

It is true, as defendants say, that *Slaboszewski v. Johnson*, 11 Ill.App.2d 241, 136 N.E.2d 560 (1st Dist.1956) is not directly on point, because Section 25(2)(d) comes into play on death of a partner—and of course that is not involved here. But *Slaboszewski* remains relevant, because the court specifically relied on the authority conferred by Section 37 as well as Section 25(2)(d). And in any event the Act (which is after all a *uniform* act) has been read in a sensible way—not in the stultifying way urged by defendants—wherever the precise question posed here has arisen. In short, the authority given by the Act allows Smith to bring this action on behalf of the Goldstick & Smith partnership.

■■■ As for defendants' second argument, they should reread the familiar summary judgment standard most recently reannounced by our Court of Appeals in *Korf v. Ball State University*, 726 F.2d 1222, 1226 (7th Cir.1984): All reasonable factual inferences must be drawn in favor of the non-movants, here Goldstick & Smith. As the Opinion expressed in painstaking detail, such reasonable inferences from the evidence presented on the summary judgment motion forestall judgment for defendants now.

Defendants want this Court to give one item of evidence preclusive weight, to the exclusion of evidence that could lead to a contrary conclusion.[2] That is not the function of summary judgment. *First National Bank Co. of Clinton, Illinois v. Insurance Co. of North America*, 606 F.2d 760, 767 (7th Cir.1979) (Fed.R.Civ.P. 56 does not authorize district court to *try* the issues of fact).

### Conclusion

Defendants' motion to reconsider is denied. This case will proceed toward trial.

2. Defendants make much of the fact both participants in the telephone conversation that allegedly produced the oral agreement—Kusmiersky and Goldstick—testified to the same effect. What they miss is that at least where reasons have been advanced to question credibility, this Court is not obligated to credit such evidence.

See *Thornton v. Evans*, 692 F.2d 1064, 1074–77 (7th Cir.1982). Here, for example, Smith has pointed to Goldstick's continued business relationship with Kusmiersky as rendering suspect their present testimony—especially in light of the other objective factors identified in the Opinion as supporting Smith's position.